JASPER E. JONES, Judge.
The defendant, Arthur P. Brown, Jr., was convicted of manslaughter, a violation of LSA-R.S. 14:31, and was sentenced to serve twelve years at hard labor.[1] He appeals the conviction and sentence.
We affirm.
FACTS
During the early morning hours of July 13, 1985, a family disturbance in Rayville, Louisiana, resulted in a homicide when the defendant fired a pistol into a single family residence. The defendant was arrested and subsequently charged by a grand jury with the second degree murder of the deceased and with the attempted second degree murder of the defendant’s estranged wife, violations of LSA-R.S. 14:27, 30.1.[2] He was tried by jury and found not guilty of the attempted murder of his wife but found guilty of the responsive verdict of manslaughter of the deceased, LSA-C. Cr.P. art. 814 A.3.; LSA-R.S. 14:31.[3]
The defendant appeals the conviction and sentence and asserts the following assignments of error:
Assignment of Error #1 — The trial court erred by granting the State’s re *427 quested special jury charge number three.
Assignment of Error #2 — The manslaughter conviction is contrary to the law and evidence.
Assignment of Error #3 — The trial court erred in refusing to grant the defendant’s request for a mistrial after the State’s prejudicial arguments in closing arguments.
Assignment of Error #4 — The sentence of twelve years at hard labor amounts to excessive and cruel punishment.
[[Image here]]
Assignment of Error #1 — The special jury charge.
LAW ON SPECIAL WRITTEN CHARGES TO THE JURY
“The state and the defendant shall have the right before argument to submit to the court special written charges for the jury. Such charges may be received by the court in its discretion after argument has begun. The party submitting the charges shall furnish a copy of the charges to the other party when the charges are submitted to the court. A requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given.” LSA-C.Cr.P. art. 807.

Did the trial court err?

The defendant argues that the trial court erred in accepting the State’s special jury charge number three which informed the jury that a manslaughter conviction could be rendered if they found that the homicide occurred from the criminally negligent discharge of a firearm. In particular it is asserted the instruction unduly prejudiced the defendant as it reinstructed them on criminal negligence and unfairly accentuated the predicate offense as a possible basis for a manslaughter conviction.[4] The defendant also argues the instruction is an incorrect statement of the law as the legislature never intended that the criminally negligent discharge of a firearm could result in anything other than negligent homicide, a non-responsive verdict to the present charge.
The record does not include the State’s special charge number three but its substance was related to the jury as follows:
"... Criminal negligence exists when although neither specific nor general intent is present there is such disregard of the interest of others that the offender’s conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances....
... If you find that the defendant did not have a specific intent to commit the *428 crime of second degree murder but was criminally negligent in the commission of the act which resulted in the death of the deceased, you may still find the defendant guilty of manslaughter if you find that he was in the course of the perpetration of the criminally negligent discharging of a firearm where it was foreseeable that it might result in death or great bodily harm to a human being, even though the death was not intended by the defendant.”
We conclude this assignment is meritless. In regard to the prejudicial effect of the instruction, the record does not show that the reference to criminal negligence and to the criminally negligent discharge of a firearm in this special instruction was of such a nature as to overemphasize the predicate felony offense contained in LSA-R.S. 14:94 of illegal use of weapons or dangerous instrumentalities and we find no undue prejudice to the defendant by the giving of this special instruction to the jury. When giving the special charge, of which appellant complains, the court was charging the jury on the law applicable to the case as required by C.Cr.P. Art. 802.[5] Included in the definition of manslaughter contained in LSA-R.S. 14:31 is a homicide committed without the intent to cause death or great bodily harm when the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Article 30 (first degree murder) or 30.1 (second degree murder). Illegal use of weapons is a felony defined in 14:94 which is not enumerated in 14:30 or 14:30.1 and therefore is one of the predicate offenses for manslaughter where there is no intent to cause death or great bodily harm. Included in the definition of illegal use of weapons contained in 14:94 is the “criminally negligent discharging of any firearm.” From this review of the law applicable to the case we find the trial court committed no error when it gave the special instruction. The provisions of the applicable criminal statutes are clear and contain no ambiguity and under these circumstances we find it unnecessary to discuss the legislative history relied upon by the applicant to support his contention that the Legislature never intended for the criminally negligent discharging of a firearm to serve as an element of a predicate offense for manslaughter.[6]
*429 Assuming, arguendo, that the instruction was not legally correct, the evidence of the non-enumerated felonies that support the manslaughter conviction is so overwhelming, as is related in the analysis of Assignment of Error # 2, that any error contained in the special instruction must be deemed harmless. LSA-C.Cr.P. art. 921.
Assignment of Error #2 — The conviction is contrary to the law and the evidence.

Law On The Sufficiency Of The Evidence Needed To Support A Criminal Conviction

The constitutional standard of review for the sufficiency of evidence to support a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the State proved the essential elements of the crime beyond a reasonable doubt. The statutory rule as to circumstantial evidence is that assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence. The circumstantial evidence rule is not a stricter standard of review than the more general reasonable juror’s reasonable doubt formula but a helpful methodology for its implementation by an appellate court in cases which hinge on the evaluation of circumstantial evidence. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Outlaw, 485 So.2d 217 (La.App. 2d Cir.1986); LSA-R.S. 15:438. Stated another way, the test is the reasonableness of the ultimate conclusion on the facts and inferences drawn from the facts in a particular case. State v. Woods, 494 So.2d 1258 (La.App. 2d Cir.1986).

Is the evidence sufficient to support the conviction?

The defendant argues the jury predicated the manslaughter conviction on his commission of a non-enumerated felony or intentional misdemeanor directly affecting the person as provided by LSA-R.S. 14:31(2)(a).[7] The defendant also points out the only non-enumerated felonies the jury was instructed to consider were the illegal use of weapons,[8] and aggravated criminal damage to property[9] along with aggravated assault,[10] which is an intentional misdemeanor directly affecting the person. He contends the illegal use of weapons charge is not applicable to the manslaughter statute where criminal negligence is the predicate. He also contends the aggravated criminal damage charge and the weapons charge were not established as the State did not prove he had the requisite intent to endanger human life. Finally, he concludes the aggravated assault charge was not established as the State did not prove he had the intent to direct the assault toward the deceased. He asserts the only crime established was negligent homicide, a charge non-responsive to second degree murder.[11]
*430 Thelma Brown, the defendant’s wife, and the defendant had been physically separated since 1984. Thelma and their children were living with her relatives while the defendant lived with his mother, all in Ray-ville, Louisiana. Thelma and the defendant saw each other regularly as they rode together to Monroe, Louisiana, on a daily basis so she could commute to work and he could rebuild their former house which had been destroyed by fire. The couple had continuing marital problems and Thelma had been unresponsive to the defendant’s requests to “get back together.”
On the night of July 12, 1985, Thelma was visiting with her aunt, Violet Banks, who was the victim in this homicide. At approximately 10:00 p.m. the defendant arrived and they spoke briefly after which he departed. Thelma next encountered the defendant when he returned at approximately 1:00 a.m. the next morning demanding that she come outside and talk. In the residence at that time were other adults watching television and an infant. She testified she saw the defendant immediately inside the front door and in view of the others in the residence. She and the defendant then went outside to his automobile where he demanded that she and their infant son depart with him. Thelma Brown related she agreed to allow him to leave with one child, Jarvis, a 14 month old son, but that she refused to go with him. She then returned to the residence and the defendant began honking the car horn in an attempt to have her return. Donald Brown, the defendant’s brother, had been telephoned and soon arrived on the scene. He persuaded Thelma to come outside and attempt to resolve the situation with the defendant. Thelma and Donald were standing with one another outside in the carport and the defendant was positioned a short distance away by the open passenger door of his automobile. While Thelma and Donald were attempting to talk, the defendant produced a pistol and fired it in the direction of Thelma Brown. She saw the flash of the weapon and heard the gunshot and then ran into the house shouting for everyone to get down onto the floor as the defendant had a gun and was shooting at her. She related she heard a total of five or six shots fired in short fashion. She eventually crawled to a front bedroom and discovered her aunt lying on the bed with her head near a pool of blood. She testified her aunt had crawled in the bedroom to use the telephone to call the police and had been struck by one of the bullets. Violet Banks was subsequently pronounced dead on arrival at a local hospital. The defendant drove away after firing the last shot.
Donald Brown testified he was the defendant’s brother and arrived on the scene after having been telephoned about the disturbance. He observed that the defendant was extremely upset and appeared intoxicated. Donald then went to the front door of the residence and asked Thelma Brown to come outside. From this position he could see the other individuals in the residence sitting in the dining area and den in a direct line with the door. As he and Thelma were talking the defendant, who was standing by his automobile, produced a gun and fired it five times. Donald Brown testified he did not see where the defendant was aiming the weapon. After the altercation the defendant arrived at Donald’s house and asked Donald to take care of the child and take him to turn himself in at the sheriff’s office.
The defendant testified that on the evening of July 12,1985, he arrived at a bar in Rayville, Louisiana, at approximately 8:00 p.m. and, until his departure at approximately 10:30 p.m., he consumed approximately seven mixed drinks, some of which were made of gin and some of which were straight whiskey “on the rocks.” The defendant admitted he was intoxicated at the time of the shooting but not so much so that he wasn’t aware of his actions. He left the bar and went to his mother’s home and borrowed her car. He then drove to Violet Banks’s house where Thelma and his son were staying. He arrived and went to the front door and conversed with Thelma’s aunt who invited him inside. The defend *431 ant admitted observing the other adults in the house watching television. Thelma and he then went outside and she agreed to get their son, Jarvis, and depart with the defendant. After delivering Jarvis to the defendant, Thelma returned to the house in order to retrieve a diaper bag but she never returned. Defendant then began honking his horn and soon observed his brother, Donald Brown, arrive. The defendant asked Donald to talk to Thelma and persuade her to “come on.” When Thelma emerged from the residence and stood talking to Donald, the defendant took a pistol from his automobile and began firing. The defendant related he shot twice over the house after which Thelma “broke and ran.” He related he shot three more times but wasn’t intending to hit anyone. He admitted he was frustrated and upset over his marital problems and that he intentionally shot into the residence in order to inflict damage. One shot went through a bedroom window and struck and killed the deceased. He acknowledged he meant to shoot that particular window but was unaware anyone was in the bedroom and thought everyone was in the den where he had previously observed them.
Immediately after the shooting, the defendant went -to see Ron Adcock, a bail bondsman, seeking help to make bail on his anticipated arrest and in order to find out if anyone was hurt. Adcock’s telephone call, for information of the shooting, revealed that Violet Banks had been struck by one of the bullets and had been taken to the hospital. The defendant then left with Jarvis and went to see a friend, Rick Mason, whom he asked to hide the weapon. Mason refused to hide the weapon. The defendant then hid it under a brick beside Mason’s residence. The defendant then went to Donald Brown’s house and asked him to transport him to the sheriff’s office and to take care of Jarvis. Prior to arriving there, the defendant washed his mouth with mouthwash in order to hide the alcohol on his breath.
Thomas Alexander, a policeman with the Rayville Police Department, testified at trial. He participated in the investigation of the homicide on the morning of July 13, 1985. He observed two bullet holes in the front door and one bullet hole in an adjacent bedroom window. The three bullets were eventually recovered and secured for later examination. Officer Alexander testified the defendant later informed them that he had hidden the weapon at a residence and agreed to take them there and retrieve it. The weapon was secured for later examination by the Louisiana Crime Lab.
Ralph Ilgner, an employee of the Louisiana Crime Lab, was accepted as an expert in firearms identification and testified he examined the weapon and bullets secured in the investigation and submitted to him by the police. He related the weapon was test fired twice and the test bullets compared with two of the bullets found at the scene of the crime. The third slug retrieved at the crime scene was too deformed for a comparison of it to be made with the test bullets. It was the opinion of the expert that the two bullets retrieved from the residence were fired by Brown’s weapon retrieved from near the Mason residence.
Linda Banks, daughter of the victim, testified she was present in her mother’s residence at the time of the shooting. Also in the house was Linda’s daughter, her mother, her two sisters, a brother, a boyfriend of one of her sisters and the defendant’s wife. Linda observed the defendant step into the house after her mother, Violet Banks, answered the door, and soon step outside to await Thelma Brown. Linda also observed Thelma go outside to meet the defendant and a short time later come into the residence and get her child. Linda later observed Thelma run back into the house yelling “everyone get on the floor— A.P. [defendant] is out there shooting.” The witness concluded by testifying everyone fell to the floor and she heard four shots in all. She soon crawled to the front bedroom and found her mother lying on her bed with a wound to the head. She also testified the bullet holes in the front door and through the bedroom window resulted from the shooting.
Dr. David Thompson, coroner, testified that Violet Banks died as a result of a *432 gunshot wound to her head and that the bullet must have imbedded in the wall of the residence after exiting the deceased’s skull.
The testimony of the witnesses, and of the defendant in particular, clearly establishes the requisite intent to damage the residence of Violet Banks out of frustration over his marital problems. The defendant’s testimony and other evidence of his activities in securing the assistance of a bail bondsman, in hiding the weapon and in attempting to hide the alcohol on his breath by use of mouthwash all establish he was not so intoxicated that he was unaware of the nature of his criminal conduct. Cf., State v. Shanes, 493 So.2d 825 (La.App. 2d Cir.1986). The defendant knew other adults were in the house at the time of the shooting. The factors fully support a finding that the defendant committed the intentional discharge of a firearm where it was foreseeable that death or great bodily harm could result to the occupants. LSA-R.S. 14:94. These facts also support a finding that the defendant intended to damage the decedent’s residence even though it was foreseeable human life might be endangered. LSA-R.S. 14:55.[12] Cf., State v. May, 362 So.2d 516 (La.1978). Finally, these facts fully support that the defendant placed Thelma Brown in fear of being shot. The defendant also placed the other occupants of the house in fear of being shot because they were told the defendant was shooting at the house by Thelma and they could hear the shots as they were fired. All of the occupants of the house reacted to the fear by getting on the floor. The victim had crawled down the hall to the phone in her bedroom just seconds before she received her fatal gunshot intentionally fired by the defendant into a house known by him to be occupied by her. These circumstances establish that the defendant committed aggravated assault, a misdemeanor directly affecting the person, in violation of LSA-R.S. 14:31, 14:37 and a predicate under the manslaughter article. Cf., State v. Connors, 432 So.2d 308 (La.App. 5th Cir.1983).
The record establishes the defendant did commit the intentional discharge of a weapon, aggravated criminal damage to property and aggravated assault, all when it was foreseeable that death could result or human life could be endangered. The tragic homicide, as an additional factor, makes applicable the manslaughter statute.[13] State v. Brumfield, 329 So.2d 181 (La.1976).
Assignment of Error #3 — The State’s comments.
LAW ON MISTRIALS AND IMPROPER COMMENTS TO A JURY
A mistrial should be ordered when prejudicial conduct inside the courtroom makes it impossible for the defendant to receive a fair trial. When a remark or comment unduly prejudices a defendant, the trial court may grant the mistrial or may admonish the jury to disregard the comment if it is satisfied an admonition is sufficient to assure a fair trial. A prosecutor should avoid remarks predicting societal costs and consequences of a not guilty verdict. A verdict will be overturned on the basis of an improper remark if the reviewing court is firmly convinced the jury was influenced by the remarks and the remarks contributed to the verdict. A mistrial is a drastic remedy and should be declared only when unnecessary prejudice results and such a decision lies within the sound discretion of the trial court. State v. Harriman, 469 So.2d 298 (La.App. 2d Cir.1985), writ den., 474 So.2d 1304 (La.1985), cert. den., — U.S. —, 106 S.Ct. 1958, 90 L.Ed.2d 366 (1986); LSA-C.Cr.P. arts. 770, 771, 774, 775.

Should the mistrial have been granted?

The defendant argues that remarks made by the State during closing arguments were prejudicial to his case and the trial court should have declared a mistrial.
The record shows that during closing arguments the State made the following comments:
*433 Mr. Coenen: May it please the Court, under the law the State has the opportunity to close with rebuttal. Going over a few points made by the defense attorney — first of all, of course, if you vote not guilty, the man does go free.
Mr. Aycock: Objection, your Honor— mistrial. Could we have an argument outside the presence of the jury?
Court: Okay.
The trial court refused to declare a mistrial or give an admonition to the jury.
We determine that the State’s remark does not warrant a reversal of the conviction. The record fails to show that this remark amounts to unnecessary prejudice or that it contributed to the verdict in an impermissible manner. Considering the overwhelming evidence of the defendant’s guilt, the trial court was correct in refusing to declare a mistrial. It was also within its discretion in refusing to admonish the jury as the comment is nothing more than a common sense understanding of a not guilty verdict, an option the jury was fully instructed upon; and in context, did not arise to the level of an inflammatory effort to appeal to the jurors’ passions.
Assignment of Error #4 — Excessiveness of the sentence.
LAW ON THE REVIEW OF CRIMINAL SENTENCES
The test imposed by the reviewing court in determining the excessiveness of a sentence is two-pronged. First, the record must show that the trial court took cognizance of the criteria set forth in LSA-C. Cr.P. art. 894.1. The trial judge is not required to list every aggravating or mitigating circumstance so long as the record reflects that he adequately considered the guidelines of the article. State v. Nelson, 449 So.2d 161 (La.App. 4th Cir.1984); State v. Hammonds, 434 So.2d 452 (La.App. 2d Cir.1983), writ den., 439 So.2d 1074 (1983). The articulation of the factual basis for a sentence is the goal of article 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with article 894.1. State v. Lanclos, 419 So.2d 475 (La.1982). The important elements which must be considered are the defendant’s personal history (age, family ties, marital status, health, employment record), prior criminal record, seriousness of offense and the likelihood of rehabilitation. State v. McGhee, 469 So.2d 1051 (La.App. 2d Cir.1985).
Second, the reviewing court must then determine whether the sentence imposed is too severe given the circumstances of the case and the background of the defendant. A sentence violates LSA-Const. Art. 1, § 20 (1974) if it is grossly out of proportion to the seriousness of the offense or nothing more than the purposeless and needless infliction of pain and suffering. A sentence is considered grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it is so disproportionate as to shock the sense of justice. State v. Lewis, 430 So.2d 1286 (La.App. 1st Cir.1983), writ den., 435 So.2d 433 (La.1983). The trial judge has wide discretion in the imposition of a sentence within the statutory limits and such a sentence should not be set aside as excessive absent a manifest abuse of discretion. State v. Nelson, supra; State v. Hammonds, supra.
In selecting a proper sentence, a trial judge is not limited to considering only a defendant’s prior convictions and may properly review all prior criminal activity. State v. Palmer, 448 So.2d 765 (La.App. 2d Cir.1984), writ den., 452 So.2d 695 (La.1984).

Is the sentence excessive?

The defendant argues the trial court failed to give proper weight to the mitigating considerations revealed in the presentence report. He asserts his sentence should be no greater than five years at hard labor as he is guilty of no more than negligent homicide.
The record reveals the 33 year old defendant is a second felony offender having been convicted of theft in Texas in 1978 and placed on active supervised probation for three years. This is the only past crim- *434 mal activity of record and the presentence report reflects the defendant has a stable employment history, although he was unemployed at the time of the instant offense. He has a reputation of being a good student and graduated from high school in 1971. He was also well thought of by friends in the community and had no history of problems with alcohol. His wife and their three minor children have lived apart from him since 1984.
At the sentencing hearing the trial court acknowledged the favorable information in the presentence report and noted as being commendable the fact the defendant had proven himself to be a hard worker and had taken care of his mother financially while he was in Texas. The trial court also acknowledged the receipt of 114 form letters requesting leniency. The trial court ruled, however, the tragic loss of life was a very serious consideration and that it was necessary the defendant be incarcerated as a lesser sentence would deprecate the seriousness of the crime.
We conclude the imposed sentence does not violate LSA-Const. Art. 1, § 20 (1974). The record is clear that the defendant’s history shows many favorable considerations. However, the record also shows that a human life was needlessly taken and that intoxication and a firearm were involved and that the period of incarceration was substantially less than the statutory 21 year maximum. The sentence imposed reflects a thoughtful balancing of the relevant considerations and we cannot say the trial court’s decision amounts to an abuse of discretion or a violation of the sentencing guidelines.
CONCLUSION
The conviction and sentence are AFFIRMED.

. See note 3.

. § 30.1. Second degree murder
Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; or
(2) When the offender is engaged in the perpetration or attempted perpetration of aggravated rape, aggravated arson, aggravated burglary, aggravated kidnapping, aggravated escape, armed robbery, or simple robbery, even though he has no intent to kill or to inflict great bodily harm.
Whoever commits the crime of second degree murder shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.

. Art. 814. Responsive verdicts; in particular
A. The only responsive verdicts which may be rendered when the indictment charges the following offenses are:
3. Second Degree Murder:
Guilty
Guilty of manslaughter.
Not guilty.
[emphasis added]
14:31. Manslaughter
Manslaughter is:
(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender’s blood had actually cooled, or that an average person’s blood would have cooled, at the time the offense was committed; or
(2) A homicide committed, without any intent to cause death or great bodily harm.
(a) When the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Articles 30 or 30.1, or of any intentional misdemeanor directly affecting the person; or
Whoever commits manslaughter shall be imprisoned at hard labor for not more than twenty-one years.

. LSA-R.S. 14:10 Criminal intent
Criminal intent may be specific or general:
(1) Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.
(2) General criminal intent is present whenever there is specific intent, and also when the circumstances indicate that the offender, in the ordinary course of human experience, must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act.
LSA-R.S. 14:11. Criminal intent; how expressed
The definitions of some crimes require a specific criminal intent, while in others no intent is required. Some crimes consist merely of criminal negligence that produces criminal consequences. However, in the absence of qualifying provisions, the terms "intent” and "intentional” have reference to "general criminal intent."
LSA-R.S. 14:12. Criminal negligence
Criminal negligence exists when, although neither specific nor general criminal intent is present, there is such disregard of the interest of others that the offender’s conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances.
LSA-R.S. 14:94. Illegal use of weapons or dangerous instrumentalities
A. Illegal use of weapons or dangerous in-strumentalities is the intentional or criminally negligent discharging of any firearm, or the throwing, placing or charging of any article, liquid, or substance, where it is foreseeable that it may result in death or great bodily harm to a human being.
B. Whoever commits the crime of illegal use of weapons or dangerous instrumentalities shall be fined not more than one thousand dollars, or imprisoned with or without hard labor for not more than two years, or both, [emphasis added]

. Art. 802. General charge; scope
The court shall charge the jury:
(1) As to the law applicable to the case;
(2) That the jury is the judge of the law and of the facts on the question of guilt or innocence, but that it has the duty to accept and to apply the law as given by the court; and
(3) That the jury alone shall determine the weight and credibility of the evidence.

. The basis for said argument is asserted in defendant’s brief as follows:
By 1942, Louisiana had adopted the restricted felony murder rule along with our current negligent homicide statute.
The Louisiana Manslaughter Statute had developed to include intentional killings reduced by provocation; as well as unintended killings during felonies not covered by the murder statute. Because of the confusion created by the artificial classification of misdemeanors as mallum prohibition and mal-lum in se, Louisiana accepted as manslaughter only those killings occurring during the commission of an intentional misdemeanor directly affecting the person.
In 1973, the Louisiana Legislature enacted our first and second degree murder statutes. These statutes continued the restricted felony murder rule.
The purpose of these changes was to shift all negligent killings to the newly developed negligent homicide statute. For an unintended killing to become manslaughter, it had to occur during a serious intentional crime. Examples include battery, aggravated assault, simple assault, kidnapping, burglary, aggravated criminal damage to property.
Illegal use of weapons or dangerous instru-mentalities (R.S. 14:94) developed from a number of misdemeanor statutes. By 1942, the statute existed in its current form of Sub-paragraph A and was punishable as a misdemeanor. Today as then, it can be committed by either an intentional or criminaly negligent act. In 1958, felony penalties were added for second and subsequent offenses. However, it was not until 1968 that a first conviction carried a felony penalty.
Prior to 1968, a homicide occurring during a commission of criminally negligent illegal use of weapons or dangerous instrumentalities would have been classified as negligent homicide. No rational basis exists and the Legislature never contemplated that by amending the penalty for this statute, it would catapult an otherwise negligent homicide into manslaughter. For these reasons, criminally negligent illegal use of weapons or dangerous instrumentalities cannot provide the underly *429 ing felony for A.P. Brown’s manslaughter conviction. (footnotes omitted)

. See note 3.

. See note 4.

. LSA-R.S. 14:55. Aggravated criminal damage to property
Aggravated criminal damage to property is the intentional damaging of any structure, watercraft, or movable, wherein it is foreseeable that human life might be endangered, by any means other than fire or explosion.
Whoever commits the crime of aggravated criminal damage to property shall be fined not more than ten thousand dollars, imprisoned with or without hard labor for not less than one nor more than fifteen years, or both, [emphasis added]

. LSA-R.S. 14:36. Assault defined
Assault is an attempt to commit a battery, or the intentional placing of another in reasonable apprehension of receiving a battery.
LSA-R.S. 14:37. Aggravated assault
Aggravated assault is an assault committed with a dangerous weapon.
Whoever commits an aggravated assault shall be fined not more than five hundred dollars, or imprisoned for not more than six months, or both.

.LSA-R.S. 14:32. Negligent homicide
Negligent homicide is the killing of a human being by criminal negligence.
The violation of a statute or ordinance shall be considered only as presumptive evidence of such negligence.
Whoever commits the crime of negligent homicide shall be imprisoned with or without hard labor for not more than five years, fined not more than five thousand dollars, or both. *430 See also LSA-C.Cr.P. art. 814 at note 3 and LSA-R.S. 14:12 at note 4.

. See note 9.

. See note 3.